UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KIRA MARIE HERAL, <br><br> Plaintiff, <br><br> vs. <br><br> SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES; MATT ALTHOFF, Cabinet Secretary, South Dakota Department of Social Services, in his individual and official capacity; TERESA M. SCHULTE, Administrative Law Judge, in her individual and official capacity; BETH ADSERO, DSS Benefits Specialist, in her individual and official capacity; KATIE HECK, Regional Operations Manager of Department of Human Services, Long Term Services & Supports Division, in her individual and official capacity; STATE OF SOUTH DAKOTA; LARRY RHODEN, Governor of South Dakota, in his individual and official capacity; SOUTH DAKOTA DEPARTMENT OF HUMAN SERVICES, Long Term Services & Supports Division; KERRI KONECHNE, LTSS Case Management Specialist, Department of Human Services, in her individual and official capacity; DANIELLE SCHAEFFER, R.N., DHS Nurse Consultant, in her individual and official capacity; TONI ROUNDS, R.N., DHS Nurse Consultant, in her individual and official capacity; HEATHER KRZMARZICK, Director, LTSS, South Dakota DHS, in her individual and official capacity; THOMAS MARTINEC, Deputy Secretary, DHS, in his individual and official capacity; and LESLIE LOWE, HCBS Operations Administrator, LTSS, in her individual and official capacity; <br><br> Defendants. | 4:25-CV-04186-KES <br><br><br> ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND GRANTING PLAINTIFF'S MOTION TO EFFECTUATE SERVICE ON NEWLY ADDED DEFENDANTS |

Plaintiff, Kira Heral, moves under Federal Rule of Civil Procedure 65 for a preliminary injunction against defendants, South Dakota Department of Social Services (DSS); South Dakota Department of Human Services (DHS), Long Term Services & Supports Division; Matt Althoff, Cabinet Secretary, DSS; Teresa M. Schulte, Administrative Law Judge; Beth Adsero, DSS Benefits Specialist; Katie Heck, Regional Operations Manager of DHS; the State of South Dakota; Larry Rhoden, Governor of South Dakota; and six other South Dakota DHS employees: Kerri Konechne, Danielle Schaeffer, Toni Rounds, Heather Krzmarzick, Thomas Martinec, and Leslie Lowe. Docket 42; Docket 41 at 2-4. Defendants oppose the motion for a preliminary injunction. Docket 48. Heral also moves for an order directing the United States Marshal to serve newly added defendants. Docket 44. The court issues the following order.

## FACTUAL BACKGROUND

Heral alleges that defendants terminated her medically necessary Home and Community-Based Options and Person-Centered Excellence (HOPE) waiver services effective April 5, 2025. Docket 41 at 7-8. She asserts claims for (1) deliberate indifference to serious medical needs in violation of the Fourteenth Amendment (2) procedural due process, (3) violations of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA), (4) municipal liability, (5) violations of the South Dakota Constitution, and (6) negligence and gross negligence. *Id.* at 22-28. Following the termination of services, Heral alleges that she experienced blood-glucose fluctuations requiring emergency intervention. Docket 41-1 at 5-17, 38-44. She seeks,

2

among other relief, an injunction requiring the immediate restoration of HOPE waiver services. *See* Docket 42.

South Dakota administers the HOPE waiver program through the Department of Human Services (DHS). Docket 49-1 at 11. The program permits the State to use Medicaid funds to provide home- and community-based services to qualifying individuals who would otherwise require nursing-facility care. *Id.* To participate, an applicant must satisfy three principal eligibility requirements: age or disability status, financial eligibility, and a required nursing-facility level of care. *Id.* at 12.

The application process is divided between two agencies. *Id.* at 11. The Department of Social Services (DSS) determines whether the applicant qualifies financially and is eligible for Medicaid. *See id.* at 12. DHS then evaluates whether the applicant requires a nursing-facility level of care. *See id.*; Docket 48 at 3. That determination begins with a home-care assessment, a standardized tool used to evaluate the applicant's physical, cognitive, and functional needs. Docket 49-1 at 8, 13-14. The results are then reviewed by a DHS nurse consultant, who determines whether the applicant meets the required level of care. *Id.* at 8; Docket 48 at 3.

Applicants who satisfy the financial and level-of-care requirements work with a case-management specialist to develop an Individual Support Plan (ISP). *See* Docket 49-1 at 34. The ISP identifies the participant's assessed needs, goals, supports, and authorized services. *See id.* Relevant here, those services include homemaker assistance, personal-care services, nursing services, and

3

structured family caregiving. *Id.* at 43. Except for structured family caregiving, HOPE waiver services are not provided on a 24-hour basis. Docket 50 ¶ 11.

The ISP is developed through a review of the assessment results, consideration of available informal supports, and discussion with the participant regarding needs and goals. Docket 49-1 at 34. Once the participant has been determined financially eligible, found to meet nursing-facility level-of-care requirements, and completed and signed an ISP, authorized services may begin. *Id.* at 22, 39.

Nursing services under the HOPE waiver program must be medically necessary and tied to an assessed need. *Id.* at 39, 71. Participants receiving nursing services must also obtain a physician's order identifying the services required and the hours authorized. *Id.* at 40, 72. In addition, the total cost of authorized services generally may not exceed the cost of nursing-facility care, unless an exception applies. *Id.* at 27; *see also* 42 C.F.R. § 441.302(e).

The State does not directly provide HOPE waiver services. *See* Docket 49-1 at 24. Instead, services are delivered by private providers that voluntarily participate in the program and are reimbursed with Medicaid funds. *Id.* Participation in the HOPE Waiver program is voluntary for service providers. *Id.* at 24-26. To furnish waiver services, an agency must enroll with South Dakota Medicaid and be approved for the particular service categories it will provide. *Id.* Nursing services must be provided through a Medicare-certified home-health agency and performed by a registered nurse. *Id.* at 71-72. DHS monitors service delivery through periodic reviews and reassessments. *Id.* at 42. If a

participant is later determined not to require a nursing-facility level of care, the participant is disenrolled from the program. *Id.* at 98.

Heral first received HOPE waiver services in December 2023. Docket 25-9. At that time, she was approved for homemaking and personal-care services totaling 6.5 hours per week. *Id.* at 2-4. She did not receive nursing services. *See id.* at 1-5.

That changed in October 2024 when Heral qualified for the structured family caregiving program. Docket 25-8 at 1. The program permits a participant to reside with a designated caregiver who provides substantial assistance and supervision. Docket 49-1 at 75-77. The caregiver must be a family member or fictive kin who lives with the participant and receives support and a stipend through an approved provider. *Id.* at 77.

Heral's caregiver moved out of her residence in April 2025. Docket 25-10. Because continued eligibility for structured family caregiving depended on that living arrangement, the change triggered a reassessment. *See* Docket 49-1 at 41, 77. Defendant Beth Adsero conducted the reassessment on April 9, 2025, and forwarded the results to DHS nurse consultant Danielle Schaeffer. *See* Docket 26-1; Docket 26-3. Based on the information provided during the assessment, Schaeffer determined that Heral fell within the "self-care" category and no longer met the nursing-facility level-of-care requirement. Docket 26-3.

Heral appealed the April 2025 level-of-care determination to the Office of Administrative Hearings. Docket 28-1 at 41-46. After a hearing and additional written submissions, the administrative law judge affirmed the determination

5

on August 5, 2025. *Id.* Heral did not seek judicial review in state court. *See* SDCL § 1-26-30.2 (providing that judicial review is available for final administrative decisions).

Several weeks later, Heral submitted a new application for HOPE waiver services. Docket 27-1. DSS determined that she remained financially eligible and referred the application to DHS for a new level-of-care assessment. *See* Docket 27-2. On November 20, 2025, case-management specialists Kerri Konechne and Stephanie Fleming conducted that assessment. Docket 27-3.

During the assessment, Heral reported that she was attending occupational therapy twice each week and required hands-on assistance with showering. *Id.* at 16, 36. After reviewing the assessment, nurse consultant Toni Rounds concluded that Heral again satisfied the nursing-facility level-of-care requirement and therefore qualified for HOPE waiver services. Docket 27-4.

Konechne and Heral then discussed the services that would best address Heral's assessed needs. Docket 50 ¶ 4. At the time, Heral did not have a qualifying family member or fictive kin residing with her and therefore did not qualify for structured family caregiving. *Id.* ¶ 5. The assessment identified concerns regarding medication management, nutrition, bathing, diabetes management, and household maintenance. Docket 27-3 at 5, 13-14, 16-17, 24, 30-31.

Based on those needs, Konechne authorized two hours per week of homemaking services, two hours per week of nursing services, and two hours per week of personal-care services, for a total of six hours per week. Docket 49-

6

2; Docket 50 ¶¶ 7, 10. The authorized services included assistance with household tasks, medication management, monitoring of Heral's medical condition, and personal hygiene. Docket 49-2 at 2-3, 5.

Heral's services were authorized on November 21, 2025, and began on December 2, 2025. Docket 27-4. As of May 2026, Heral continued to receive those services. *See* Docket 56 at 6.

Shortly after services were authorized, Konechne discussed the service schedule with Heral. Docket 50 ¶¶ 10-11. Heral expressed dissatisfaction that she had not qualified for 24-hour care. *Id.* ¶ 11. Konechne explained that the HOPE waiver program does not provide 24-hour care outside the structured family caregiving program and that individuals requiring continuous nursing supervision are ordinarily referred to nursing-facility care. *Id.*; Docket 50-1 at 11-12.

Heral also submitted letters from several physicians expressing support for increased services. Docket 35-4 at 1-2, 15; Docket 52-7; *see* Docket 50 ¶ 14. According to Konechne, however, the letters did not identify specific unmet medical needs that would justify additional nursing services under the program. Docket 50 ¶ 15. Konechne nevertheless contacted Heral's providers and service team to determine whether additional medically necessary services should be authorized. *Id.* ¶¶ 16-19. Heral's six-month review occurred on May 15, 2026. *Id.* ¶ 19. *See* Docket 56. As of the filing of this order, no provider has identified specific additional nursing services that were medically necessary.

## PROCEDURAL HISTORY

Heral commenced this action on September 22, 2025. Docket 1. Her original complaint asserted a variety of federal- and state-law claims, including claims under Title II of the ADA and § 504 of the RA. *Id.* Along with her complaint, Heral moved for a preliminary injunction seeking restoration of the HOPE waiver services that had been discontinued following the April 2025 reassessment. Docket 2.

While that motion was pending, Heral reapplied for the program, was reassessed, and again qualified for HOPE waiver services. Docket 31 at 6; Docket 23 at 7; Docket 24 ¶ 14; Docket 27-4. As a result, the court denied her request for a preliminary injunction as moot. Docket 31 at 6.

On April 9, 2026, Heral filed an amended complaint adding several defendants, including South Dakota DHS Long Term Services & Supports Division, and a number of South Dakota DHS employees involved in the administration of the HOPE waiver program. Docket 41 at 2-4. Although the amended complaint contains additional factual allegations, it largely reasserts the claims alleged in the original complaint, including claims under the ADA and the RA. *Id.* at 25-26.

Heral also filed a renewed motion for preliminary injunction. Docket 42. The motion alleges that Heral continues to experience episodes of hyperglycemia and contends that the six hours of weekly services authorized under the HOPE waiver program are inadequate to meet her needs. *Id.* at 3, 6-9. According to Heral, the current level of services places her at risk of

institutionalization and violates the integration mandates of the ADA and RA. *See id.* at 13-14.

Heral seeks an order requiring: (1) an independent functional-capacity assessment conducted by a person unaffiliated with DHS; (2) a written report containing service-hour recommendations; (3) weekly reports documenting services delivered; (4) advance notice and court approval before any reduction or termination of services; and (5) authorization of at least 20 hours of home-health services per week. *Id.* at 15. The court now turns to Heral's motion for a preliminary injunction.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). Its "primary function . . . is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (internal quotation marks omitted). To determine whether a preliminary injunction is appropriate, the court considers the following factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (alterations in original) (internal quotation marks omitted); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

9

1981) (en banc). The *Dataphase* test for preliminary injunctive relief requires a flexible analysis. *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). Thus, when weighing these factors, "no single factor is in itself dispositive." *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). "[A]ll of the factors must be considered to determine" whether the balance weighs toward granting the injunction. *Id.*

## DISCUSSION

### I. Motion for Preliminary Injunction

#### A. Likelihood of Success on the Merits

"While no single factor is determinative, the probability of success factor is the most significant." *Cigna Corp.*, 103 F.4th at 1342 (internal quotation marks omitted). "When determining the likelihood of [plaintiff's] success on the merits, [the court does] not have to decide whether [a plaintiff] will ultimately win[, but an] injunction cannot issue if there is no chance of success on the merits." *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (cleaned up) (citations omitted). Further, the Eighth Circuit does not require a "party seeking preliminary relief [to] prove a greater than fifty per cent likelihood that [the party] will prevail on the merits." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (internal quotation marks omitted). But the plaintiff must show a "fair chance of prevailing," *Jet Midwest*, 953 F.3d at 1045 (internal quotation marks omitted), and "need only establish a likelihood of succeeding on the merits of any one of

10

[its] claims," *Richard/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (internal quotation marks omitted).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes state agencies. 42 U.S.C. § 12131(1)(B). A qualified individual with a disability is a person who meets the essential eligibility requirements for the public service, program, or activity at issue. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998).

To establish a prima facie claim under Title II of the ADA, a plaintiff must show that: (1) she is disabled within the meaning of the statute; (2) she is otherwise qualified for the benefit in question; and (3) she was excluded from the benefit because of her disability. *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). A public entity may defend against such a claim by showing that the requested accommodation would fundamentally alter the nature of the service, program, or activity or impose undue financial or administrative burdens. *Gorman*, 152 F.3d at 912.

Section 504 of the RA similarly prohibits disability discrimination by programs or activities receiving federal financial assistance. 29 U.S.C. § 794(a); *Jim C. v. United States*, 235 F.3d 1079, 1080 (8th Cir. 2000). To prevail on an RA claim, a plaintiff must establish that: (1) she is a qualified individual with a disability; (2) she was denied the benefits of a federally funded program or

11

activity; and (3) the denial occurred because of her disability. *Gorman*, 152 F.3d at 911. Like the ADA, the RA recognizes a fundamental-alteration defense. *Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1170 (M.D. Ala. 2010).

The ADA and the RA are substantially similar. With the exception of the RA's federal-funding requirement, courts generally analyze claims under the two statutes together. *Randolph*, 170 F.3d at 858.

The ADA's implementing regulations require public entities to administer services, programs, and activities in "the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This requirement is commonly referred to as the ADA's integration mandate. *See Talton v. Kinkade*, 2012 WL 5305334, at *2 (W.D. Mo. Oct. 25, 2012).

In *Olmstead v. L.C. ex rel. Zimring*, the United States Supreme Court held that the unjustified institutionalization of persons with disabilities may constitute discrimination under Title II of the ADA. 527 U.S. 581, 597 (1999). Courts have since interpreted *Olmstead* to require public entities to provide community-based services when such services are appropriate, the affected individual does not oppose them, and the services can be reasonably accommodated. *See J.P. by Ogden v. Belton 124 Sch. Dist., Mo. State Bd. of Educ.*, 2020 WL 3643131, at *3 (W.D. Mo. July 6, 2020).

At the same time, the Supreme Court has emphasized that a state's obligations under the integration mandate are not unlimited. The ADA does not establish a federal standard of care for medical services, nor does it require states to provide any particular level of benefits to individuals with disabilities.

12

*Olmstead*, 527 U.S. at 603 n.14. The disability statutes likewise do not guarantee any particular level of medical care or require states to continue providing previously authorized services indefinitely. *See Talton*, 2012 WL 5305334, at *4.

The ADA also does not require a state to create entirely new services or fundamentally alter existing programs to accommodate an individual's preference to remain at home. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 611 (7th Cir. 2004). The integration mandate requires states to avoid unjustified isolation. It does not require states to maximize benefits or provide every service that a participant believes is necessary. *See Olmstead*, 527 U.S. at 603 n.14; *Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 F. App'x 215, 221 (6th Cir. 2018); *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999).

On this record, Heral has not demonstrated a likelihood of success on the merits of her ADA or RA claims. Although the parties do not appear to dispute that Heral is a qualified individual with a disability, the present record does not show that defendants excluded her from the HOPE waiver program or denied her benefits because of her disability.

The central premise of Heral's motion is that the six hours of weekly services currently authorized through the HOPE waiver program are inadequate to meet her needs. *See* Docket 42. She contends that defendants should be required to authorize at least 20 hours of weekly home-health services, obtain an independent assessment regarding the level of services she

13

requires, and implement various reporting and notice requirements. *See id.* at 15. But the ADA and RA do not guarantee a particular level of benefits or establish a federal standard of care for medical services. *Olmstead*, 527 U.S. at 603 n.14. Nor do those statutes require a state to maximize services or provide every accommodation that a participant believes is necessary. *See Talton*, 2012 WL 5305334, at *4.

The record reflects that Heral presently receives HOPE waiver services. *See generally* Docket 54 ¶ 5. Following Heral's November 2025 reassessment, DHS determined that she qualified for the program and authorized two hours per week of homemaking services, two hours per week of nursing services, and two hours per week of personal-care services. Docket 49-2; Docket 50 ¶¶ 7, 10. Those services began on December 2, 2025, and continue today. *See* Docket 50 ¶ 12. The assessment identified concerns relating to medication management, nutrition, bathing, diabetes management, and household maintenance, and the services authorized by DHS were directed toward those assessed needs. Docket 27-3 at 5, 13-14, 16-17, 24, 30-31.

The record further reflects that DHS considered Heral's request for additional services. Docket 50 ¶¶ 15-19. In January 2026, Heral submitted letters from several physicians expressing support for increased services. *See id.* ¶ 14. Although several physicians expressed support for increased services, the letters did not identify specific additional nursing services that should be authorized under the HOPE waiver program. *See* Docket 43-32 at 3-4; Docket 43-57; Docket 35-4 at 1. Konechne nevertheless contacted Heral's providers

and service team to determine whether additional medically necessary services should be authorized. Docket 50 ¶¶ 15-19. As of the filing of this order, no provider had identified additional medically necessary nursing services that should be added to Heral's service plan.

The record also undermines Heral's contention that defendants have denied her access to a community-based alternative. The HOPE waiver program does not provide 24-hour care except through the structured family caregiving program. Docket 50 ¶ 11; *see generally* Docket 49-1. To qualify for that program, a participant must reside with a designated family member or fictive kin who provides substantial care and supervision. Docket 49-1 at 77. Heral previously participated in that program, but her caregiver moved out of her residence in April 2025, rendering her ineligible for structured family caregiving. *See* Docket 25-10.

When Konechne and Heral discussed service options following the November 2025 reassessment, Heral did not have a qualifying caregiver residing in her home and therefore could not receive structured family caregiving services. Docket 50 ¶ 5. Konechne explained that 24-hour care is not available through the HOPE waiver program outside the structured family caregiving program and that individuals requiring continuous nursing supervision are ordinarily referred to nursing-facility care. Docket 50 ¶¶ 10-11; *See* Docket 50-1.

Heral principally relies on the ADA's integration mandate. *See* Docket 42 at 9. But the integration mandate addresses unjustified institutionalization and

15

the unnecessary segregation of individuals with disabilities. *See Olmstead*, 527 U.S. at 597. The current record does not show that defendants have denied Heral access to community-based services or forced her into an institutional setting. To the contrary, defendants determined that Heral qualified for community-based HOPE waiver services, authorized those services, and continue to provide them. *See* Docket 50 ¶ 7. Heral remains in the community and continues to receive services through the program.

At bottom, Heral's motion seeks a judicial determination that the State must provide more services than it has presently authorized. Her request for an order requiring at least 20 hours of home-health services seeks a substantial increase in benefits beyond those currently authorized. That is not the type of claim the integration mandate was designed to address. Courts have repeatedly recognized that the ADA and RA do not require states to provide a particular quantity of services, maintain a participant's preferred level of benefits, or create new services to accommodate an individual's desire to remain at home. *See Olmstead*, 527 U.S. at 603 n.14; *Radaszewski*, 383 F.3d at 611; *Talton*, 2012 WL 5305334, at *4.

To be sure, Heral has submitted evidence that she experiences significant medical challenges, including complications related to diabetes. *See, e.g.,* Docket 43-25; Docket 43-30; Docket 43-32; Docket 43-41; Docket 43-45; Docket 43-50; Docket 43-53; Docket 43-55; Docket 43-57; Docket 35-4. But the question at this stage is not whether additional services would be beneficial. The question is whether the record presently demonstrates that

16

defendants are discriminating against Heral because of her disability or are violating the ADA's integration mandate. On the current record, Heral has not made that showing.

The arguments Heral sets forth in her reply brief do not alter the court's conclusion regarding her likelihood of success on the merits. First, Heral argues that defendants rely on the January 2026 version of the HOPE Waiver Policy Manual even though some of the relevant events occurred under the October 2024 version. Docket 51 at 5. But Heral has not identified any material difference between the two versions that affects the issues presently before the court. *Id.* at 5-6. Nor has she shown that any alleged difference undermines the court's conclusion that the ADA and RA do not require the State to provide a particular level of services or a participant's preferred amount of care. *Id.* At this stage, the court is not persuaded that any distinction between the October 2024 and January 2026 manuals materially affects the preliminary-injunction analysis.

Heral next argues that the assessments relied upon by defendants were flawed because they were conducted without reviewing her medical records, were based largely on participant self-reporting, and were performed by personnel whom she contends lacked adequate training. *Id.* at 7. She also points to Konechne's alleged statements that she did not believe Heral required 24-hour care and that she had not reviewed certain paperwork. *Id.* at 8. Finally, Heral disputes defendants' characterization of the physician letters in the record, noting that several providers expressed concern that six hours of

17

weekly services was insufficient and supported additional accommodations. *Id.* at 8-9.

At this stage, the court need not resolve those factual disputes. Even assuming Heral is correct that the assessments were conducted in the manner she describes, that Konechne made the statements attributed to her, and that the physician supported letters support an increase in services, those facts do not establish a likelihood of success on Heral's ADA or RA claims. The issue before the court is not whether defendants made the best assessment of Heral's needs, whether additional services would be beneficial, or even whether defendants should have authorized more services. Rather, the question is whether defendants denied Heral access to community-based services because of her disability or otherwise violated the ADA's integration mandate. The current record does not support such a finding.

Indeed, the record reflects that Heral was reassessed in November 2025, found eligible for the HOPE waiver program, and authorized homemaking, nursing, and personal-care services. She continues to receive those services. At most, Heral's arguments challenge the adequacy of the services provided and the process by which defendants determined the amount of services to authorize. But the ADA and RA do not guarantee a particular level of benefits, establish a federal standard of care, or require a state to provide every service that a participant believes is necessary. *See Olmstead*, 527 U.S. at 603 n.14. Consequently, Heral's criticisms of the assessment process do not materially

18

alter the court's conclusion that she has not shown a fair chance of success on the merits on her ADA or RA claims.

Finally, Heral argues that the relief she seeks would not fundamentally alter the HOPE waiver program. Docket 51 at 10-12. The court need not resolve that issue at this stage. Even assuming the requested relief would not constitute a fundamental alteration of the program, Heral has not demonstrated a fair chance of success on the underlying elements of her ADA or RA claims.

As such, the court concludes that Heral has not established a fair chance of success on the merits of her ADA or RA claims. This factor weighs against granting preliminary injunctive relief.

### B.    Threat of Irreparable Harm

The court next considers whether Heral has demonstrated that she is likely to suffer irreparable harm in the absence of preliminary relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although irreparable harm need not be established with absolute certainty, *see id.* at 22, it must be likely rather than merely possible, and it must be sufficiently imminent to create a clear and present need for equitable relief, *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted).

Heral contends that the six hours of weekly services currently authorized through the HOPE waiver program are insufficient to meet her needs. She argues that, absent additional services, she faces an increased risk of hyperglycemic episodes, diabetic ketoacidosis, emergency medical intervention,

19

long-term complications from uncontrolled blood glucose levels, and deterioration in her physical and cognitive functioning. Docket 42 at 13-14. Heral further argues that these injuries cannot be adequately remedied through an award of monetary damages because lost health and permanent medical complications cannot be undone after the fact. *Id.*

The court does not discount the seriousness of Heral's medical conditions. The record reflects that Heral suffers from diabetes and other significant health challenges. The potential consequences of poorly managed diabetes can be severe. If the record demonstrated that defendants were denying Heral access to medically necessary services or that an imminent medical crisis was likely absent judicial intervention, the court would view the irreparable-harm inquiry differently.

But the present record does not establish that likelihood. Heral is not currently without services. Following her November 2025 reassessment, defendants determined that she qualified for the HOPE waiver program and authorized homemaking, nursing, and personal-care services directed toward her assessed needs. Docket 49-2; Docket 50 ¶¶ 7, 10. Those services began in December 2025 and continue today. Docket 50 ¶ 12. Moreover, when Heral submitted letters from her physicians seeking increased services, Konechne contacted Heral's providers and service team to determine whether additional medically necessary services should be authorized. *Id.* ¶¶ 16-19. According to the evidence presently before the court, no provider identified specific additional nursing services that were medically necessary but unavailable

20

under Heral's existing service plan. *See id.* ¶ 15; Docket 43-32 at 3-4; Docket 43-57; Docket 35-4 at 1.

Heral's asserted injuries therefore depend on a premise that has not been established on the current record—namely, that the services presently authorized are medically insufficient and that the additional services she seeks are necessary to prevent imminent harm. Although several physicians expressed support for increased services, the record does not indicate that any provider identified a specific medical need that is currently going unmet or opined that Heral faces an imminent risk of hospitalization, institutionalization, diabetic ketoacidosis, or other acute medical crisis absent the immediate expansion of services ordered by the court. *See* Docket 50 ¶ 15; Docket 43-32 at 3-4; Docket 43-57; Docket 35-4 at 1.

Nor has Heral shown that the specific relief she requests is necessary to prevent the harms she identifies. She asks the court to require defendants to authorize at least 20 hours of weekly home-health services, obtain an independent functional-capacity assessment, provide weekly reporting, and obtain court approval before reducing services. Docket 42 at 15. But the current record contains little evidence connecting those particular forms of relief to the prevention of the anticipated injuries. The possibility that additional services might improve Heral's health or quality of life is not enough. A preliminary injunction may issue only when the threatened harm is likely and imminent in the absence of judicial intervention. *Winter,* 555 U.S. at 22.

The court recognizes that Heral's alleged injuries involve health and safety concerns that are not readily compensable through money damages. To the extent Heral faces an increased risk of medical complications arising from her underlying conditions, those injuries would be difficult or impossible to fully remedy after the fact. This consideration weighs in Heral's favor.

On balance, however, the court concludes that Heral has not established a likelihood of irreparable harm sufficient to justify the extraordinary remedy of a preliminary injunction. The record demonstrates an ongoing provision of services, ongoing review by DHS personnel, and an absence of evidence showing that additional medically necessary services have been identified but denied. While Heral has shown the possibility of future harm if her medical conditions worsen, she has not shown that such harm is sufficiently likely and imminent to warrant preliminary injunctive relief. Thus, this factor weighs against granting the motion.

### C.    Balance of Harms and Public Interest

The final *Dataphase* factors require the court to consider the balance between the injury the movant will suffer absent an injunction and the injury that granting the injunction would inflict on the nonmovant, as well as the public interest. *Dataphase*, 640 F.2d at 113. The balance of harms and public interest factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Heral argues that she faces serious health consequences if additional services are not authorized. Docket 42 at 13-14. As discussed above, the court

22

does not discount those concerns. The record reflects that Heral suffers from significant medical conditions, and the court recognizes the importance of ensuring that individuals with disabilities receive services to which they are entitled under federal law.

The public likewise has a strong interest in ensuring that state agencies comply with federal law. As the Eighth Circuit has observed, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (internal quotation marks omitted). Thus, if Heral had demonstrated that defendants were likely violating the ADA or the RA, the balance of harms and public interest factors would weigh strongly in favor of injunctive relief.

But, as explained above, Heral has not made such a showing. The court has concluded that Heral has not shown a fair chance of success on the merits of her ADA or RA claims, nor has she established that irreparable harm is likely absent an injunction.

Granting the requested relief would also require the court to substantially alter, rather than preserve, the status quo. Heral asks the court to order defendants to authorize at least 20 hours of home-health services per week, obtain an independent functional-capacity assessment, provide ongoing reports to both Heral and the court, and refrain from modifying services without advance notice and court approval. Docket 42 at 15. Such relief would effectively place the court in an ongoing supervisory role over the administration of a state Medicaid waiver program and would require the court

23

to substitute its judgment for that of the professionals charged with assessing participant needs and authorizing services under the program.

The public has an interest not only in the enforcement of federal disability laws, but also in the orderly administration of state programs and the appropriate allocation of limited public resources. *See Olmstead*, 527 U.S. at 597 (recognizing that states may consider available resources and the needs of other individuals with disabilities when administering community-based services). On the current record, the requested injunction would impose significant administrative obligations on defendants without a corresponding showing that federal law likely requires such relief.

The court therefore concludes that the balance of harms and public interest factors do not favor the issuance of a preliminary injunction. When considered together with Heral's failure to demonstrate a likelihood of success on the merits and a likelihood of irreparable harm, these factors weigh against granting the extraordinary remedy of preliminary injunctive relief.

## II.    Motion for Service of Process by United States Marshal

Heral also moves for an order directing the United States Marshal to serve the newly added defendants: South Dakota DHS, Kerri Konechne, Danielle Schaeffer, Toni Rounds, Heather Krzmarzick, Thomas Martinec, and Leslie Lowe. Docket 44 at 1-2. Similar to her prior motion for service of process on defendants by United States Marshal (Docket 10), which the court granted (Docket 11), Heral contends that her disabilities remain a substantial barrier to service by her, service on government defendants requires technical compliance

under the Federal Rules of Civil Procedure, defense counsel has not agreed to accept service, and financial hardship bars her from serving the newly added defendants. *Id.* at 3-4.

The court grants Heral's motion. As previously mentioned, *see* Docket 11 at 2, the number of newly added defendants and Heral's complex medical conditions provide good cause to direct the USMS to serve the newly added defendants. Although the court denied Heral's motion to proceed in forma pauperis, the number of newly added defendants instructs that it may be cost prohibitive for Heral to effectuate service on the newly added defendants. As such, the motion is granted.

## CONCLUSION

Based on the foregoing, it is ORDERED:

1. That Heral's motion for a preliminary injunction (Docket 42) is denied.

2. That Heral's motion for service of process by United States Marshal on newly added defendants (Docket 44) is granted.

3. That the Clerk of Court shall send Heral seven blank summonses and Marshal Service Forms (Form USM-285) so that she may cause the amended complaint (Docket 41) to be served on the newly added defendants.

4. That Heral shall complete and return to the Clerk of Court a summons and USM-285 form for each defendant. Upon receipt of the completed summonses and USM-285 forms, the Clerk of Court will issue the summonses.

5.  That the United States Marshal Service will serve the completed summonses, together with a copy of the amended complaint (Docket 41) and this order upon each newly added defendant.

6.  That each newly added defendant will serve and file an answer or other responsive pleading to the amended complaint on or before 21 days following the date of service.

7.  That Heral is on notice of this court's intention to dismiss her claims without prejudice, pursuant to Rule 4(m), against any newly added defendant that is not served **by July 31, 2026,** unless Heral can show good cause for her failure to serve the newly added defendant(s).

Dated June 15, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE